Bridgeport Fittings, Inc. v. Bridgeport Fittings, Inc. Next case is Arlington Industries v. Bridgeport Fittings, 2013-1400-1401. Ms. Klune. Thank you, Your Honors. May it please the Court. The Board here erred as a matter of law in finding Claims 1, 5, and 6 obvious based on a combination of three references that date between 10 and 80 years before Arlington's invention. The Board made a number of significant errors, but I would like to address the following three errors with the Court this morning. First, the Board failed to compare Schnicker's multi-component retaining structure to the actual claim limitation of retainers secured in the openings of the inbound end. Second, the Board failed to establish that it's Schnicker's retainer alone or in combination with Grindle that would achieve the guiding and advancing limitation. And finally, it improperly rejected... Doesn't Grindle have everything in the claim, but the one portion, the retainer, and that's in the other references? No, Your Honor. Actually, it's a combination of three references. The Board relied upon Grindle for the pair of parallel openings, the housing, but it relied on Schnicker for the spring steel retainers, and then it relied on Rotor for the adapter limitation of Clause D. But the problem is that the retainer limitation is really key, and that is Clause C that we're really going to be focusing on this morning. The fact is Clause C of Claim 1 requires several different limitations, none of which the Board found in respect to these limitations. First, and in fact, I think it would help the Court if you refer to pages 23 and 24 of our brief when we're talking about Schnicker's retainer. So the Claim 1 requires first that there has to be two spring steel retainers secured in each of said openings in the inbound end. Those retainers must have inwardly extending tangs that receive and engage separate cables from the inbound end, and that those tangs have to be capable of guiding and advancing separate cables in a manner that advances the cables towards the outbound end. Those tangs also have to be capable of restricting removal of the cables from the inbound end. And finally, the retainers must be made of spring steel. Now, the District Court erred and committed clear error by disregarding those express limitations in their obvious determination. If you look to Schnicker, Schnicker, as disclosed, is a grounding ring. And as we show on page 23, it's shown in red in Figure 4. The Board focused solely on Figure 4 in the exploded view and called that basically, but it acknowledged in its finding of fact, S-4, which is found at A-15. It acknowledged that the grounding ring of Schnicker does not work as a retainer unless it is combined with the grommet and the gland nut. It does perform some retaining function, does it not? Only after it's been combined with the gland nut being rotated for the second time. So basically, it describes two tightenings. I follow you, but you have two components that provide some retention capability, but the spring does provide some retention capability. Only after the grommet has actually created a compression fit, and even the Board found that. So there's actually two findings of fact from the Board where they specifically state that. They state it in S-4 where they say that it's only due to the grommet interference fit that the grounding ring has any kind of resistance against the cable. And then secondly, they state it again in A-54 in the rejection of the rehearing on appeal where they say, Schnicker's retainer does not work without additional parts. And then it says, i.e., the grommet and the gland nut. Well, the problem is that the grommet and the gland nut are not actually secured onto the grounding ring until after the cable is already inserted and the conductors are outside the outbound end. If you look at Figure 2, you'll see that the conductor is basically out before the grommet is able to be compressed. And that's because, of course, as Schnicker described, it is slidably inserted. So it's basically loose within the connector until after there is this compression. And that, you don't even have to find that the Board erred on that particular finding of fact because they actually found that. Contrary to Bridgeport's argument that the Board ever found that the retaining, the grounding ring by itself could be a retainer. The Board did not find that at the finding of fact 4. It specifically said it was due to the grommet. And if you look at Column 7 in the Schnicker reference, it specifically described how there's two separate tightenings. And it's not until the second tightening that there's any securing whatsoever. I mean, I can understand your argument and it would make more, it would be more relevant to me if we were talking about a 102 rejection in anticipation. But this is 103. So we're looking at these various references for what they teach, not the precise structure or the precise operation or the precise nature of all of the components. But we're looking to the references for what they teach, one of ordinary skill and the art. And that seems to me that's exactly what the Board did here in looking to Schnicker for that retention component. Well, actually, Your Honor, the only two experts that were presented any testimony, both Arlington's expert and Bridgeport's expert, said that those skills and the art would not look to Schnicker to actually combine with Grindle. So the only evidence that we have on the record is that those skills and the art would not find the teachings of Schnicker to actually be combinable with Grindle. Mr. Kiley, Bridgeport's own expert, actually stated that in a deposition in this underlying litigation in this case. And the fact is that Schnicker, while it's true, Your Honor, that it is an obvious misdetermination, there still has to be, as this court found in the In re Wilson case and in the recent case of Gianelli, that there's at least some motivation to combine or that it would at least be obvious to combine. And it's black letter law that if it requires substantial reconstruction of the primary reference in order to combine these two references, then it wouldn't be obvious to combine. And so here's the situation when you look at Schnicker. Schnicker is a threaded connector. And you're talking about a single retainer that is used with a grommet and a gland nut. There is no evidence in any of the references that anyone skilled in the art would find it obvious to take a connector that's with a gland nut and a grommet and then combine it with a non-threaded connector of Grindle and actually have to restructure the entire housing of Grindle in order to then try to hold this retainer function of Schnicker. But when you combine that also with the second half of the retainer clause of Clause C, you see that the reason why it also can't meet the guiding and advancing limitation is that the guiding and advancing has to be done from the opening of the inbound end and it has to be done by the tang, not the shoulders of Grindle. That's what the claim requires. The specification makes it very clear that that is an important function, that those cables are being guided in advance at the outset of the opening of the inbound end. And we know that that cannot happen with a combination of Schnicker with Grindle because of the fact that the way this gland nut works, the cable would already be fully inserted before there's any securing mechanism. And so because of that, you can't have any guiding and advancing if the cable is already all the way through to the outbound end before there has been the second tightening of the gland nut on the grommet. More importantly, we know that Schnicker was only concerned with directing the cable straight down the bore of the connector. And because it's only concerned with that, as the board actually recognized, it would not have been considering the fact that we have two separate cables that have to be guided in advance towards the offset outbound end of the claimed invention or in Grindle. And because it's not considering that, it doesn't have any teaching to that effect. And in fact, the kinds of Schnicker wouldn't do the guiding and advancing that the claimed invention requires. What part of the Springsteel cable retainers in GRETS performs this guiding function that you're talking about? The tang. The claim specifically requires that it has to be the tang that engaged the cable at the opening of the inbound end and then does the guiding and advancing towards the offset outbound end. But you seem to be arguing that it provides some sort of guiding toward a central outlet, as if it sort of guided it to turn somehow. Right. Well, the claim construction is that it has to guide or permit the forward movement, and even the board actually recognized that it was an inherent quality of a duplex connector that because you're taking two inlets, you're taking cables from two inlets, and you're going out a single offset outbound end, that it is offset. So there has to be at least some guiding and advancing. But the guiding and advancing is not necessarily provided by the tangs. The tangs certainly will guide it in a forward direction, retain it from backing out, but then something else is going to move it along to a central section. Well, actually, the claims in the specification actually specifically discusses how the tang should actually be doing the guiding and advancing to prevent the mutual interference of the separate cables. And that's very clear in the specification of GRETS. Yeah, I know it says that. I'm just trying to figure out what it is about the tangs that does that and why that's any different than the tangs in the SCHNITKA reference. They both seem to me provide guidance toward the outlet end and provide a retention force that prevents the cable from backing out. What happens later in terms of the wires coming together and going out the outlet end is a different thing. Yeah, one of the embodiments specifically talks about having the tangs actually pushing one of the cables down and the other pushing one of the cables up. That's one specific embodiment. But the fact of the matter is at least there has to be some evidence that there is guiding and advancing from the tangs. And I would disagree with the fact that SCHNITKA shows that whatsoever because we know that SCHNITKA's tines are not actually engaging the cable until after the conductor is specifically through the connector. And that is at, I believe, column 7, I believe it's 33 through 37 or somewhere to that effect. And moreover, the fact that we know for a fact that the board actually relied on Grindle's shoulder because it acknowledged that SCHNITKA would not have actually been guiding and advancing towards an offset outbound end. So it relied upon the shoulders in combination. The problem is that the claim requires that it's not part of, that it can't be just the shoulders. It has to be the tines that do some guiding and advancing. What about the language here in column 7, line, I guess it's 48 plus. Since the angle leading tines engage the irregular corrugated outer surface 28 of the cable, a force tending to pull the cable out of the connector is resisted since the grounding ring cannot move rearwardly of the connector due to the engagement of the grommet with the grounding ring in the wash. Right, that's after the pull. And if you look above that, Your Honor, that is after the conductor is already completely through. Then the grommet has a second tightening, and then it does the securing. So we absolutely agree that there is securing after the cable's already through. But if you look straight, if you look above to the inserting of the cable is at 22 through 27 where it specifically talks about the fact that during the insertion, the electrical conductors will just pass through the closure, pass through the grommet, pass through the grounding ring. Isn't that the same thing that happens with GRETS? No. In fact, in GRETS, because of the fact that the retainer is secured in the opening of the inbound end, it requires that the tanks are actually locking into the armored cable and actually doing guiding and advancing, and that's described in the patent. But when you put the cable in the connector, the wires are already through and out the other end, are they not? No, actually, Your Honor, they're not all the way through. They actually have to be, in fact, the description of the specification all discusses in the patent, and the claim requires that it actually engages and guides the cables that are separate towards the outbound end in a manner in which it's guided towards the outbound end. I'm confused. I'm confused. We're talking about the wires inside the coaxial cover or the cover? Right, so basically the armored cable is removed slightly and gets put through, and once it engages on the armored cable, then it guides that towards the offset outbound end. I mean, even the board found as a finding of fact, as I said, Your Honor, so that's not even something that you have to reverse. The fact is that you just have to look to see whether or not the board, in its own findings of fact, applied this to the actual claim limitations, which they did not. More importantly, they didn't actually give any consideration to Arlington's established secondary considerations, and that was a clear error of law as well, especially in a case like this, where the showing of obviousness, we would contend, wasn't even made, let alone, at a minimum, it was a very weak showing. And so you have established commercial success of Arlington. There's a two-supplier market. Did the board conclude that there was not sufficient nexus shown, and that's why they didn't give a lot of weight to the secondary consideration? Yes, and the board's determination of nexus is a clear error. It actually has no substantial evidence on the record. Arlington submitted several different aspects that show the nexus. Number one, they submitted a claim chart, which the board failed to even consider, silent, as to Arlington's claim chart, showing step-by-step how the fact that these products are commensurate with the claim. Well, silent doesn't necessarily equate to a failure to consider, right? Right, but it's unrebutted. They specifically said that they rejected the customer declarations because of the fact that the claim chart, because there was no element-by-element limitation shown of the product to the claim, and yet Arlington did submit an element-by-element showing that the products are commensurate with the claim. Moreover, since I see that my time is up, can I briefly answer the question? Just briefly answer the question, yes. Sure, sure. So they were silent on the claim chart. They rejected the customer declarations that went through one-by-one as to why they bought it for the patented features. The patented features clearly show that it's a snap-in connector, right in the field of the invention. It calls this duplex connector a snap-in cable connector with two snap-in cable retainers on the back end, and all the customers talked about that. Plus, they had advertisements and the Graco article, which is a trade journal article, talking about these particular patented features that the customers actually love, and those are all tied to these factors. I don't know if that's briefly. Sorry, yeah. But time has been consumed since we've asked a lot of questions. We'll give you two minutes for rebuttal. Thank you, Your Honor. Mr. Ungerman, before you begin, let me note that you've got a cross-appeal, and at least part of the cross-appeal is improper, so I don't want you to save time for a cross-appeal, which you may not be able to make, because with respect to arguing about claim one, priority date relating to claim one, that is simply another argument in support of the judgment, and that is not a proper cross-appeal. You've raised the issue here, but not yet the last word, and you can tell me whether I understand correctly that it's conceded that there is no longer a dispute with respect to claim three because of the priority date, and if that completely eliminates your cross-appeal, then you'll tell me why not, and in any event, you'll limit your discussion regarding the cross-appeal to avoid raising other issues in support of the judgment that you want, if that's clear. Please proceed. Thank you. May it please the Court. All the evidence before the board, before the patent examiner, has been considered through four rejections in this case of claims one, five, and six, by the board on its original hearing and by the board in its denial of rehearing. Arlington has a different view of the evidence than the board had, and Arlington is asking to substitute Arlington's view of the evidence for that of the board. That is improper. First issue, cable retainer. As Judge Lind correctly recognized, Schnitger very plainly discloses that the ring has a cable retention function. Ms. Kloon's arguments about grommet and gland nut and sequence versus non-method claims, sequence has nothing to do with this, but Schnitger uses a grommet and gland nut to hold the ring in place. The examiner found the Grindle sex group would hold the ring in place. The preferred embodiment of Arlington has three different methods to hold the ring in place. The ring is held in place. It's irrelevant what mechanism is used. The claim does not recite any particular mechanism for holding the ring in place, and Arlington had every opportunity to add a recitation of the mechanism for holding the ring in place and chose not to. Arlington challenges the cable guiding feature. That term was construed by the district court in the underlying proceeding. Ms. Kloon actually recited the correct construction, which includes permit forward movement. The board found that the tines as combined would permit forward movement. There is nothing in this claim that says deflection. And as the board correctly found, look, the shoulders on the combined would require the wires to advance through the opening in the outbound end, and that is permitting forward movement towards the outbound end. It just turns out that I happen to have been an electrician before going to engineering school and law school, and you are correct. One of these armored cables has wires sticking out the front end about this far beyond the corrugated section. So in all of these connectors, those wires are already going to be out the front end before the cable ever engages in any tines or any other retaining mechanism. In the coaxial sheath at the outside, my understanding is that it's sort of incapable of fitting through the outlet end and won't be bent or moved or curved. It simply moves down the inlet ends until it stops. Correct? Correct. It's a metal-wound shell, basically. And the electrician actually sit there with a hacksaw and cut into the metal and pulled an 8-inch piece off of it. So this idea of schnittger as combined with grindle won't guide. It certainly permits the forward movement towards the outbound end, and this idea of deflection is not in the claims if it were a requirement of the claims, that would evidence a fundamental disagreement over the scope and the meaning of the claims, a matter that was not addressed. The board also carefully, carefully weighed all of the evidence submitted on the so-called secondary indicia. The board found that 96% of the sales that Arlington pointed to included an unpatented feature. The board found... Now, there was one reference that... one piece of evidence that Arlington submitted that was not prepared precisely for this re-examination or dispute between the parties, and that was the Capital Now article Ms. Klune just referred to. It is page A1071, and it specifically refers to the insulator, the insulated throat, as a major plus, and that's the feature that is in 96% of the devices that Arlington points to as showing commercial success. The board weighed that and said, if this is commercial success, it's weak at best, and weighed that in light of all of the arguments and found correctly that the claims were obvious. But if there's a two-party market and they had data for their own sales and you didn't provide for yours, why do they have to have market share data which they can't get? It's not a two-party market, and what they're pointing to in their comparison in the Gretz Declaration is they're comparing the sales of a conventional duplex connector to what they claim is a patented duplex connector. So the market is duplex connectors, and the evidence shows that there are, besides these two players, six other players in the duplex connector market. So without market share, you have to consider all the evidence of sales. But if you had market share, it would be a stronger showing. Here, without market share, it's a weak showing, and even with market share, 96% included this major plus feature that is not recited in the claims and is not patented. I do want to address the cross-appeal for one moment. Claim 4 is not rejected at this time. There are grounds that we asserted against Claim 4 that were refused consideration based on the effective filing date. So Claim 4 is still at issue, and the cross-appeal would allow the patent office to consider new grounds. Claim 3 is also not currently rejected, and you're correct, both sides agreed that the board erred, and in that case, this court must remand Claim 3 to the board for further consideration. On the issue of effective filing date, here the issue is very plain. The 831 patent is a CIP of a CIP. It describes that its improvement was getting rid of this insert. The grandparent, the 661 patent, shows a housing. It shows a single opening, oval-shaped opening in the inbound end. It simply doesn't show two openings in the housing of the inbound end, and that's the particular feature. If the court doesn't have any other questions, I'll reserve the remainder of time. Thank you, and you will be able to respond on Claims 3 and 4. Briefly, with respect to the commercial success, number one, Mr. Ungerman is incorrect that the market is the duplex connectors. The market is the snap-in connectors that's been found by Judge Connor, and it has been affirmed by this court in two separate opinions that Arlington has been awarded, lost profits based on a two-supplier market. The only market is the fact that there is only Arlington and Bridgeport that make these snap-in connectors, and the evidence was unrebutted that every single year from zero sales in 1999 to 2007, that Arlington's sales increased in this brand-new market 87%, that by the time they got to 2007, they had made $17 million in these commercial products. Mr. Kiley, Bridgeport's own expert, discussed the fact that it was only a two-supplier market and that Arlington and Bridgeport's customers request and pay a premium in order to get these patented features. Arlington was awarded a preliminary injunction on these products because of the fact that Arlington practices this invention. Mr. Kiley, in a deposition after reviewing the claim, agreed that Arlington's products practice the patent. There really should be no dispute that Arlington practices patents, and so the Board erred in failing to consider Arlington's substantial evidence of commercial success. And this Court, as you've already acknowledged, Your Honor, for Claim 3 is going to be remanded, and we would ask that this Court, in the remand, that you instruct the Board to reconsider the secondary considerations in light of the fact that they failed to consider these and their nexus determination was incorrect. And I believe the Court can take into consideration these judicial findings that were not before the Board but that have been found and are a matter of record, that there is a two-supplier market, Arlington practices this invention, and Arlington and Bridgeport only, because of that, Arlington could not submit, as Judge Lori asked, we could not submit specific market share because Arlington did not have Bridgeport sales. But clearly, as this Court has previously found, $17 million is considered substantial commercial success. Number two, Mr. Ungerman incorrectly stated that the insulators were the non-patented feature that everyone was buying. The evidence clearly showed that the conventional duplex connectors, the old prior art connectors, several of them had insulators. Mr. Gress' declaration showed that, the advertisements showed that, they specifically, anytime there's an A after the product, it has an insulator. No customers would spend 75% more to get the insulator when the insulators were in the conventional duplex connectors. Thank you, Ms. Kloon. Thank you, Your Honor. Your red light is on. Mr. Ungerman has time for a cross-appeal on the cross-appeal issues, three and four. Your Honors, Ms. Kloon didn't address the cross-appeal, so unless you have any further questions, I have nothing else to add. Thank you very much. Case should be taken under advisement. All rise. Your Honor, the court is adjourned until tomorrow morning at 10 a.m. Thank you, Your Honor. Thank you. Your Honor. What's this all about? Oh, yeah. They're getting our bags. Yeah, please. Oh, yeah.